**Paul WARREN, Plaintiff, Appellee,**

v.

**UNITED PARCEL SERVICE, INC.,
Defendant, Appellant.**

No. 07–2197.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 2008.

Decided March 7, 2008.

Susan J. Baronoff with whom Murtha Cullina LLP and Hugh F. Murray were on brief for appellant.

Jeffrey Neil Young with whom McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A., Kristin Aiello, Sean Ociepka and Disability Rights Center were on brief for appellee.

John P. Gause, Commission Counsel, for Maine Human Rights Commission, amicus curiae.

Before LYNCH, Circuit Judge, SELYA and SILER,* Senior Circuit Judges.

LYNCH, Circuit Judge.

A jury found that United Parcel Service ("UPS") had discriminated on the basis of disability, under the Maine Human Rights Act ("MHRA"), against its epileptic employee Paul Warren. UPS refused to reinstate Warren to his pre-diagnosis position as a driver of a commercial vehicle, and kept him in a non-driving position at the same pay but from which he was ineligible to earn overtime as he previously had done. Warren was awarded back pay of $74,155.99. The district court ordered Warren to be reinstated "unless and until UPS has legal reasons to take him off the job." The district court also awarded

* Of the Sixth Circuit, sitting by designation.

Warren front pay for overtime from the date of his jury award until his reinstatement.

UPS appeals, arguing that four of the district court's jury instructions were in error under the MHRA disability provision. The claimed errors are in the placing of the burden for the MHRA safety defense, the elements of the MHRA safety defense, the reasonable accommodation instruction, and the "record of" and "regarded as" instruction on disability. There is no appeal from the damages award.

UPS's defense at trial was that federal law prohibits persons with epilepsy from driving commercial vehicles of 10,001 pounds or more. State law regulates the driving of trucks under that weight, and Maine law has no such flat prohibition. Nonetheless, UPS refused to reinstate Warren to drive the 8,500–pound vehicle that he drove before his epilepsy diagnosis, reasoning that as there is a safety risk resulting from epilepsy, the risk is there *regardless* of the weight of the truck, and that it wants its drivers to be able to drive all of its vehicles, including those 10,001 pounds or more.

The most significant question in this case is how Maine law treats the issue of safety risk in the context of disability discrimination. Neither the MHRA nor the decisions of the Maine Law Court flatly answer the question. The federal district court judge, predicting how Maine would address the question, concluded that Maine would treat safety solely as a matter of defense for the employer to show. The court did so based on differences in language between the federal Americans with Disabilities Act ("ADA") and the MHRA, the 1996 amendment to and recodification of the Act by the Maine legisla-

ture, and the reasoning of the Maine Law Court in other cases. We find no error in the district court's prediction based on present Maine law.[1]

## I.

Paul Warren worked as a UPS package delivery driver from 1987 until 2000, when he started suffering from symptoms associated with epilepsy. In his last year of driving, he drove the route between Rockland, Maine and Whitefield, Maine (the "Whitefield route") in an 8,500–pound delivery van.

In 2000, Warren had a "simple partial seizure" while he was driving his package delivery route. This type of seizure is characterized by a "pre-warning," which for Warren means that he perspires and develops goosebumps. During that pre-warning, Warren pulled over to the side of the road, waited for the symptoms to subside, and then continued on his route. He then went to the doctor and was eventually diagnosed with partial epilepsy. Based on consultation with his doctor, Warren decided to stop working temporarily and UPS accommodated his decision. During this time, he received disability benefits and began to take medication to control his seizures.

Because his medication was not totally effective, in early 2001, Warren was referred to another doctor who added another medication to his regimen. After treating Warren over the next few months, the doctor cleared Warren to restart work in a non-driving position at UPS in June 2001. This was about a year since he had stopped working.

---

**1.** The Maine Human Rights Commission, as amicus, has argued to this court a theory for affirmance which was not presented to the district court. In light of our reasoning, we have no need to discuss the theory.

With that medical clearance, Warren initially requested UPS find him a non-driving position. UPS said there was no such work available for Warren in the Rockland processing center. Warren then sought assistance from his union. The union filed a grievance, and a grievance committee ordered UPS to find Warren non-driving work in the Rockland center. UPS did so, and Warren returned to work at the Rockland center in January 2002, washing vehicles and loading packages into vehicles. In this non-driving position, Warren had "very minimal" opportunities to work overtime, which eliminated "at least" $300 per week from his earnings.

In September 2002, Warren's doctor informed UPS that because Warren's seizures had come under "excellent control," he had cleared Warren to resume work as a package car driver. Warren requested resumption of his former commercial driving route. UPS then referred Warren to its own doctor, an occupational medicine specialist, for a second opinion. The UPS doctor agreed that Warren's seizures were well controlled, that Warren was not at risk of "los[ing] voluntary control," and that there was no concern of "loss of consciousness." The doctor concluded that Warren could resume driving, but that Warren would not be eligible for a Department of Transportation ("DOT") commercial driver's license (a "DOT card"), which under DOT rules cannot be granted to individuals who have been diagnosed with epilepsy or are taking anti-seizure medication. See 49 C.F.R. §§ 391.41(b)(8), 391.43(f). The doctor found, however, that as long as Warren took his medications regularly, Warren was "fit for duty" and that "he may safely drive any UPS vehicle not requiring DOT licensure."

Under federal regulations, a driver is required to have a DOT card to operate any commercial motor vehicle with a gross vehicle weight rating of 10,001 pounds or more. See id. §§ 390.5, 391.11. Although not all of UPS's package trucks are 10,001 pounds or more, Warren's ineligibility for a DOT card was nonetheless relevant because it is the company's policy to require a DOT card for all of its package car drivers regardless of the size of the particular vehicle they drive. Because of this policy, UPS refused to return Warren to his driving position, and Warren continued working in his non-driving position.[2]

On June 3, 2004, Warren made a written request to return to work as a driver on the Whitefield route, a route on which an 8,500–pound vehicle is used. This litigation centers on Warren's June 2004 request. Warren made the request through his union representative, Terry Hanlon, to Sue Davis, UPS's regional labor relations manager. The request stated that Hanlon had communicated with the DOT and that the DOT had informed Hanlon that Warren would fall outside its regulations were he to drive a vehicle smaller than 10,001 pounds. Over the next few months, Davis and Hanlon spoke on several occasions regarding Warren's request. Aside from conversations with one of her employees, Hanlon, and UPS's counsel, Davis took no other steps to evaluate Warren's request. Davis testified that no individualized assessment of Warren's medical condition was conducted. In November 2004, Davis sent an e-mail to Hanlon denying the request, citing to UPS's company-wide DOT card policy.

Warren then pursued a grievance through his union representative, Hanlon.

---

2. It was disputed at trial whether, in the period of time between when Warren was cleared to return to work to a driving position in September 2002 and his request to return to work in June 2004, Warren continued to have seizures and whether he had unilaterally adjusted his medication without consulting his doctor.

In front of the grievance committee, Hanlon argued that based on the collective bargaining agreement, the ADA, and the MHRA, Warren had a disability but was nonetheless entitled to drive. The grievance committee came down somewhere in the middle. It remanded the grievance to both UPS and the union, instructing UPS to ensure Warren had eight hours of work a day in the Rockland center, but it did not order UPS to return Warren to his driving position.

In December 2004, Warren filed a complaint with the Maine Human Rights Commission charging that he was unlawfully discriminated against on the basis of disability, based on his June 2004 request for reinstatement. In June 2005, the Commission determined that there were reasonable grounds to believe that unlawful discrimination had occurred, and subsequently made attempts at conciliation with UPS. Conciliation was unsuccessful, and in September 2005, the Commission referred the case for litigation. Warren also received a right-to-sue letter from the Equal Employment Opportunity Commission in March 2006.

In April 2006, Warren filed suit against UPS in federal district court, asserting that the denial of his June 2004 reinstatement request was a violation of both the ADA and the MHRA, and seeking reinstatement to his driving position, back pay, and compensatory and punitive damages. After the suit was filed, UPS began a further evaluation of Warren's medical condition. UPS requested Warren's medical records, and its occupational health managers consulted with an outside occupational health expert to determine whether it would reinstate Warren to a driving position. After a half-hour conference call with the outside expert, the local occupational health manager, and the regional occupational health manager, the corporate occupational health manager decided that Warren would still not be allowed to return to driving. This was communicated to Warren in August 2006, and he remained in a non-driving position until trial in 2007.

After a three-day trial, the district court instructed the jury on Warren's MHRA claim; the ADA claim never went to the jury. Some of the jury instructions were issued over the objection of UPS. The jury found that UPS had discriminated against Warren on the basis of his disability. It awarded $74,155.99 in back wages, a sum the court accepted as reasonable, but no compensatory damages. The jury also found that UPS had not performed an individualized assessment. The judge upheld the jury verdict over post-trial objections by the defendant, ordered that Warren be restored to his driving job "unless and until UPS has legal reasons to take him off the job," and awarded front pay until his reinstatement and pre-judgment interest on the back pay award.

This timely appeal followed.

## II.

UPS asserts that the district court made four errors in its jury instructions:

(1) The court erred in treating Warren's potential safety risk as a defense under the MHRA, and in doing so, placing the burden of proof on the defendant, UPS.

(2) The court erred in stating that reassignment was a reasonable accommodation "only if there are no effective accommodations that will enable the employee to perform the essential functions" of the job.

(3) The judge incorrectly explained the MHRA safety defense with respect to the certainty of risk required and the timing of the individualized assessment, and failed to instruct that Warren could have waived

any right he had to an individualized assessment.

(4) The jury charge confusingly said that Warren met the MHRA's definition of disability if "he had a disability, or had a record of having a disability, or was regarded as having a disability," when the "record of" and "regarded as" prongs were not at issue.

### A. Burden of Proof on Safety Risk Under the MHRA

The defendant requested that the court instruct the jury that Warren must prove, as an essential element of his qualifications for the job, that he could drive the package delivery vehicle "in a way that would not endanger others." The district court rejected the request, instead instructing the jury that under Maine law, safety could be considered "only as an affirmative defense on the part of UPS."

■■■■ Whether safety could also be considered as an essential function of the job under the MHRA was an open question of Maine law. The district court was required to "ascertain the rule the state court would most likely follow under the circumstances, even if [the federal court's] independent judgment on the question might differ." *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996); *see also Dahar v. Jackson (In re Jackson)*, 459 F.3d 117, 121 (1st Cir.2006); *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.)*, 410 F.3d 100, 108 (1st Cir.2005). We find no error in the district court's thoroughly reasoned prediction of how the Maine Law Court would interpret the MHRA.[3] That prediction was based on a reading of Maine's statutory

scheme and on decisions of the Maine Law Court interpreting the MHRA.

The district court reasoned that the Maine legislature had specifically contemplated an employer's need for safe operations in enacting Maine Revised Statutes, title 5, section 4573–A ("Defenses"), which provides:

> 1–B. Physical or mental disability. [The MHRA] does not ... subject an employer to any legal liability resulting from the refusal to employ or the discharge of an individual with physical or mental disability, if the individual, because of the physical or mental disability, is unable to perform the duties or to perform the duties in a manner that would not endanger the health or safety of the individual or others....

The court relied on the fact that the legislature had placed this provision in the "Defenses" section of the MHRA, surrounded by other provisions that constitute affirmative defenses by the employer.

In addition, the court noted that treating safety as an affirmative defense "has consistently been the context in ... which the [Maine] Law Court has addressed it." In reaching this conclusion, the trial court relied principally on the Maine Law Court's construction of the statutory predecessor to section 4573–A in *Maine Human Rights Commission v. Canadian Pacific Ltd.*, 458 A.2d 1225 (Me.1983). There, the Maine Law Court stated: "[T]he Maine safety defense imposes upon the employer the burden of establishing that it had a factual basis to believe that, to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or

---

**3.** The Maine Law Court and the Maine legislature are free to clarify where the burden of showing safety lies. Such a clarification would be binding on federal courts interpreting the MHRA in future cases.

safety of others." *Id.* at 1234; *see Higgins v. Me. Cent. R.R. Co.,* 471 A.2d 288, 290 (Me.1984) (noting that the burden is on "an employer seeking to assert the safety defense"); *see also Plourde v. Scott Paper Co.,* 552 A.2d 1257, 1259 (Me.1989) ("To avoid liability under the MHRA, [the] employer[ ] must demonstrate that its discrimination was permitted under one of the statutorily defined exceptions to the MHRA's general prohibitions against discrimination.").

The defendant argues that instead of being viewed as an affirmative defense, the question of safety risk was more properly viewed on these facts as an essential qualification for the job, in which case it would be Warren's burden to prove that he could perform the job without endangering the health or safety of others. This argument was based primarily on this court's decision in *EEOC v. Amego, Inc.,* 110 F.3d 135 (1st Cir.1997), a case involving a depressed and suicidal nurse who was responsible for administering medication to severely mentally disabled patients. *Amego* interpreted Title I of the ADA, 42 U.S.C. § 12101 *et seq.,* to require that when, in a limited category of cases,[4] an employee's "essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others." 110 F.3d at 144. Here, UPS asserted that the Maine Law Court has not had the opportunity to determine whether, for certain jobs, safety can be viewed as an essential function and therefore part of the employee's burden to prove that he was qualified, and that there was no reason to believe that the Law Court would follow an approach different from the one in *Amego.*

The district court reasoned that, whatever the interpretation of the federal statute, the Maine Law Court had recently ruled that the MHRA and the ADA were not to be construed identically. Indeed the Maine Act, on some issues, is more protective of those with disabilities. *See Whitney v. Wal–Mart Stores, Inc.,* 895 A.2d 309, 313 (Me.2006) (referring to the ADA definition of disability as "less[ ]inclusive" than the MHRA definition).

The district court pointed out that the ADA and the MHRA are different and that the MHRA had explicitly assigned safety concerns to the category of a defense. *See* Me.Rev.Stat. Ann. tit. 5, § 4573–A(1–B). It also noted that (unlike the ADA's "direct threat" provision, which this circuit interpreted in *Amego* ) the MHRA explicitly codifies as an affirmative defense the situation in which an individual "pose[s] a direct threat to the health or safety of other individuals in the workplace." *Id.* § 4573–A(1–A). Further, when the Maine legislature amended the MHRA in 1996, it reenacted the safety defense, which had previously existed under a heading entitled "Not unlawful employment discrimination," under a heading entitled "Defenses." 1996 Me. Legis. Serv. ch. 511, § 1. All of these factors, the district court concluded, indicated that the burden of proving safety risk under Maine law rested solely with the defendant.

The placement of the burden as to any safety risk posed by a disability raises significant public policy concerns about the best way to protect both the public and the disabled. It is entirely reasonable, as the district court said, that Maine law would strike the balance in one direction and federal law the other. Definitive resolu-

---

4. We have no need to reach the issue of whether the driving position would fall within this limited category of cases under *Amego.*

tion of the direction Maine chooses, however, is most appropriately directed to the Maine courts and the Maine legislature, not the federal courts. *See Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186–87 (1st Cir.1996) (recognizing that "as a federal court hearing this state law issue . . ., we are reluctant to extend [state] law 'beyond its well-marked boundaries[ ]' " (quoting *Markham v. Fay*, 74 F.3d 1347, 1356 (1st Cir.1996))); *Kassel v. Gannett Co.*, 875 F.2d 935, 949 (1st Cir. 1989) (noting that "a federal court applying state law must be hesitant to blaze a new (and contrary) trail").

## B. *Reasonable Accommodation Under the MHRA*

 UPS objects to the district court's instruction on reasonable accommodation:

> Although an employer is not required to offer the best possible accommodation or the precise accommodation the employee requests, reassignment is a reasonable accommodation only if there are no effective accommodations that will enable the employee to perform the essential functions of the foreclosed position, here the package car driver job.

The defendant argues: (1) because safety was not instructed to be considered an essential function of the job, the jury was not allowed to consider safety in determining if there existed a reasonable accommodation, and (2) the instruction on reassignment "essentially precluded" the jury from finding that reassignment to a non-driving job would be a reasonable accommodation.

We see no error. Plaintiff argues the instruction does no more than adopt the principle that "[w]hen an employer selects among several possible reasonable accommodations, the preferred option is always an accommodation that keeps the employee in his or her existing job if that can reasonably be accomplished." *Smith v.*

*Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir.1999) (en banc); *accord Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C.Cir.1998) ("Congress saw reassignment . . . as an option to be considered only after other efforts at accommodation have failed."); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir.1998) ("Generally, transfer or reassignment of an employee is only considered when accommodation within the individual's current position would pose an undue hardship."). This court has not addressed, nor need we decide the question here, of whether to adopt such a principle or whether indeed such a principle fits the facts of this case. We view the issue in different terms.

Nothing in the instruction precluded the jury from considering safety in accord with the court's other instructions. Nothing in the instruction precluded the jury from considering modifications of the driving job as an accommodation, had UPS offered any. UPS offered none. UPS's real argument is that the instruction was wrong because it did not embody UPS's position that safety was an essential element of the job.

## C. *The District Court's Instruction on the Safety Defense*

 UPS argues that even if safety was strictly a defense, the district court erred in two respects on its instruction on the safety defense:

> To prevail on this affirmative defense, UPS must persuade you by a preponderance of the evidence that, as a result of an individualized assessment, it had a factual basis at the time in question to believe to a reasonable probability that the driving job would then or in the future endanger Paul Warren's health or safety or the health or safety of others. A mere possibility that the driving job

might endanger Warren's or others' health or safety at some indefinite future time is not sufficient.

### 1. *Certainty of Risk*

The defendant argues that including the "mere possibility" language erroneously raised UPS's burden of proof. The district court based its instruction on the Maine Law Court's decision in *Canadian Pacific*, which it found controlling on the scope of the MHRA's safety defense. *Canadian Pacific* stated: "An employer cannot ... presently deny an employee an equal opportunity to obtain gainful employment on the mere possibility that his physical handicap might endanger his or others' health or safety at some indefinite future time." 458 A.2d at 1234. Of course, *Canadian Pacific* was not concerned with a situation like Warren's, where there was no question about whether plaintiff would be an employee; Warren would be employed in any event, and the financial consequences have ˉonly to do with the opportunity to earn overtime. The district court was not required, however, to so cabin *Canadian Pacific*.

The defendant argues that the "mere possibility" language in *Canadian Pacific* is relevant only when a potential disability is at issue, as opposed to an actual disability.[5] This is an inaccurate reading of *Canadian Pacific*, which refers repeatedly to the employee's "physical handicap," not the employee's potential for a handicap. *Id.* at 1233–34.

The district court had already instructed that the defendant needed to show that it believed that there was a "reasonable probability" Warren's disability would endanger safety. The language of "mere possibility" was used by contrast. "The general guidance of the instruction was correct; we do not require magic words." *Dixon v. Int'l Bhd. of Police Officers,* 504 F.3d 73, 86 (1st Cir.2007); *see also Johnson v. Spencer Press of Me., Inc.,* 364 F.3d 368, 378 (1st Cir.2004) ("It is the district court's prerogative to craft the 'particular verbiage' that it will use in its jury instructions." (quoting *Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 62 (1st Cir. 2000))).

### 2. *Timing of Individualized Assessment*

UPS also argues that the court erred in instructing that UPS had to have conducted its individualized assessment of Warren's safety risk "at the time in question," namely between Warren's June 2004 reinstatement request and when it made its decision not to restore Warren to his job as a package car driver in November 2004. There can be no prejudice because the jury found in its verdict that UPS had never conducted an individualized assessment, so the timing of when an assessment is required is not at issue.[6]

### D. *The "Record Of" and "Regarded As" Definitions of Disability*

■ The district court, in laying out the elements of Warren's claim, instructed the jury that Warren must show that "on June

---

5. The defendant does not argue that the words "mere possibility" on their own impose a higher standard than "reasonable probability," and it is well-settled that the opposite is true. *See, e.g., United States v. Hansen,* 434 F.3d 92, 102 (1st Cir.2006) (recognizing that "mere possibility" is a lower standard than "reasonable probability").

6. Because the defendant, at trial, chose to argue that an individualized assessment had in fact been conducted, we do not address the defendant's alternate argument that the district court erred in not instructing the jury to consider whether Warren had waived his right to an individual assessment.

3, 2004, he had a disability, or had a record of having a disability, or was regarded of having a disability."

This follows exactly the definition in the MHRA:

"Person with physical or mental disability" or "individual with a physical or mental disability" means a person who:

A. Has a physical or mental disability;

B. Has a record of a physical or mental disability; or

C. Is regarded as having a physical or mental disability.

5 Me.Rev.Stat. Ann. § 4553(7–B) (2002).

The defendant argues that including the "record of" and "regarded as" prongs in the charge was error, as the plaintiff at trial claimed he had a disability, not that he had a record of a disability or was regarded as disabled. The judge's instruction was an accurate statement of the law. The defendant does not explain why the judge's instruction may have harmed defendant, and we decline to guess at an explanation.

### III.

Because we find no error in the district court's jury instructions, the judgment of the district court is affirmed.

Costs are awarded to plaintiff.